959 F.2d 239
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
AMERICAN COMPUTECH, INC., dba West Coast Medical
Specialties, a corporation, Plaintiff-Appellee,
v.
NATIONAL MEDICAL CARE, INC.; Bio-Medical Applications
Management Company, Bio-Medical Applications of North City,
Inc. dba Bio-Medical Artificial Kidney Center, a Delaware
Corporation, Defendants-Appellants.
AMERICAN COMPUTECH, INC., dba West Coast Medical
Specialties, a corporation, Plaintiff-Appellee,
v.
NATIONAL MEDICAL CARE, INC., a Delaware corporation, et al.,
Defendants,
and
J. Michael Channick, M.D.; Richard Villalobos, M.D.;
Steven M. Steinberg, M.D.; Balboa Internal
Medicine Medical Group, Inc., a
California corporation,
Defendants-Appellants.
AMERICAN COMPUTECH, INC., dba West Coast Medical
Specialties, a corporation, Plaintiff-Appellant,
v.
NATIONAL MEDICAL CARE, INC.; Bio-Medical Applications
Management Company, Inc.; Bio-Medical Applications of North
City, Inc., a Delaware Corporation, dba Bio-Medical
Artificial Kidney Center; J. Michael Channick, M.D.,
Richard Villalobos, M.D.; Steven M. Steinberg, M.D.;
Balboa Internal Medicine Medical Group, Inc., Defendants-Appellees.
 Nos. 89-55289, 89-55290 and 89-55293.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 5, 1992.
Decided April 3, 1992.
 
 Before TANG, KOZINSKI and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 * After a jury trial, American Computech, Inc., d/b/a West Coast Medical Specialties ("West Coast"), was awarded actual and punitive damages against National Medical Care, Inc. ("NMC"), Balboa Internal Medicine Medical Group ("Balboa"), and Balboa's individual doctors for violation of federal antitrust laws, interference with West Coast's prospective economic advantage, and unfair competition. NMC, a dialysis service provider, contracted with the doctors to act as medical directors for its dialysis facilities in exchange for a percentage of the net profits generated by NMC's dialysis facilities. Dennis Fox, a cross-defendant and former NMC employee, was found to have breached the covenant of good faith and fair dealing he owed NMC and was assessed both actual and punitive damages. NMC, Balboa, and the doctors appeal alleging: (1) the judgment is not supported by substantial evidence; (2) the special verdict form utilized by the jury was deficient; (3) the award of punitive damages was inappropriate; (4) the trial was tainted by prejudicial and irrelevant evidence; and (5) the award of attorneys' fees was grossly excessive and amounted to double recovery. West Coast cross-appealed the district court's ruling that it could not accept both punitive damages and attorneys' fees. Fox cross-appealed arguing the verdict against him was not supported by substantial evidence. We affirm in part, reverse in part, and remand.
 
 II
 1. SUFFICIENCY OF EVIDENCE
 
 3
 We review the jury verdict to determine if it is supported by "substantial evidence," that is, such relevant evidence as reasonable minds might accept as adequate to support a conclusion. Oltz v. St. Peter's Community Hospital, 861 F.2d 1440, 1450 (9th Cir.1988). The credibility of the witnesses and the weight of the evidence are issues for the jury and are generally not subject to appellate review. Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1024 (9th Cir.1985), cert. denied, 474 U.S. 1059 (1986).
 
 A. Relevant Market
 
 4
 NMC argues West Coast failed to prove a relevant geographic market. Market analysis is essential to West Coast's conspiracy claim under Sherman Act Section 1 and its monopolization claim under Sherman Act Section 2. See Thurman Indus., Inc. v. Pay 'n Pak Stores, Inc., 875 F.2d 1369, 1373 (9th Cir.1989). A market is defined through both its product and geographic components. Oltz, 861 F.2d at 1446. Defining the relevant market is a factual inquiry ordinarily left to the jury. Id.
 
 
 5
 "The geographic market extends to the area of effective competition ... where buyers can turn for alternate sources of supply."[1] Id. (quotations omitted). "[F]ailure to pinpoint precisely the relevant market through detailed market analysis is not uniformly fatal to a claim under Sherman Act § 1." Id. at 1448.
 
 
 6
 West Coast proposed the relevant geographic market to be central San Diego, the south bay area, and the Clairemont-Kearny Mesa area. NMC argued the relevant market was the San Diego/Imperial county area.
 
 
 7
 West Coast presented sufficient facts for the jury to find the relevant market. Based on West Coast's Exhibit 688, the evidence demonstrated that the persons living within the vicinity of a particular hospital received treatment in that region instead of travelling to a more distant location.[2] Roland testified that Balboa intended to become influential in the geographic area it was serving--the south bay, downtown San Diego, and the Clairemont-Kearny Mesa areas. West Coast demonstrated that the area in which it was seeking business was this same area. West Coast also utilized a map of the San Diego region and plotted each of the hospitals and facilities where NMC and the doctors did business.
 
 
 8
 Because market definition is a question of fact, West Coast presented sufficient evidence to support a finding that the relevant geographic market was the central, south bay, and Clairemont-Kearny Mesa areas of San Diego. Contrary to NMC's argument, the district court did not err in refusing to grant a directed verdict on this issue.
 
 B. Sherman Act--Section 1
 
 9
 West Coast alleged a conspiracy between NMC and the doctors. To establish a violation of section 1 of the Sherman Act, West Coast must demonstrate: "(1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually restrains competition."[3] Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484, 1488 (9th Cir.1991) (quotation and footnote omitted). "After these elements are established, the factfinder must weigh the procompetitive and anticompetitive effects of the challenged restraint and thoroughly examine all of the surrounding circumstances to determine whether the restraint is unreasonable." Thurman Indus., 875 F.2d at 1373. An explicit agreement between the parties has been shown and is not a challenged element.[4]
 
 
 10
 (a) Intent to Harm or Restrain Competition
 
 
 11
 NMC argues that West Coast failed to establish the requisite intent because West Coast failed to prove threats or coercion in the awarding of dialysis contracts. However, intent can be demonstrated by an inference from anticompetitive conduct. Forro Precision, Inc. v. International Business Machs. Corp., 673 F.2d 1045, 1059 (9th Cir.1982) (specific intent to monopolize under Section 2 may be proven by direct evidence, but is more commonly shown by inference from conduct). Evidence from which the jury draws an inference must tend to exclude the possibility of independent rather than collusive action. Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984).
 
 
 12
 Sufficient anticompetitive intent is proven if the plaintiff can demonstrate that the defendant intends to put the plaintiff out of business. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 77 (9th Cir.1969), cert. denied, 396 U.S. 1062 (1970). However, the mere harm to a "business rival cannot be labeled as predatory or clearly anticompetitive because the goal of prevailing against all competitors is the very essence of a competitive marketplace." Thurman Indus., 875 F.2d at 1379.
 
 
 13
 If the doctors utilized improper influence in the award of dialysis service contracts, the restraint on trade demonstrates an intent to benefit an entity in which they have a financial interest.[5] Physician involvement in the hospital contracting process, without a disclosure of financial interest in the treatment, could be viewed by a reasonable person as an intent to restrain the competitive contractual process and would be equivalent to an intent to drive a competitor out of business. West Coast also demonstrated that the doctors complained about the dialysis services provided by West Coast. Further, when the bidding process was started at one hospital, an NMC administrator drafted the hospital's required conditions for dialysis providers which required a medical director and reuse capacity, but NMC was possibly the only acute dialysis company in the country that reused dializers. This evidence supports an inference of an anticompetitive intent and tends to preclude the possibility of independent action.
 
 
 14
 Additionally, Wolford testified that he had conversations with Dr. Michael Channick in which Channick threatened to force West Coast out of business. Wolford testified Channick stated he had assured NMC that West Coast would not procure any new contracts and it would relinquish the contracts it had already obtained.
 
 
 15
 Because the evidence presented by West Coast could lead a reasonable jury to the conclusion that the relationship of the nephrologists to the contractual process unduly inhibited free competition and was action taken in conjunction with NMC, we conclude that substantial evidence supported the finding that NMC and the Balboa physicians possessed an intent to restrain competition. The jury's conclusion was based on the weight of the facts presented and an assessment of witness credibility which we will not second guess.
 
 
 16
 (b) Effect on Competition
 
 
 17
 An agreement restrains trade if it "unreasonably ... exclude[s] outsiders from participation in the trade in question." Joseph E. Seagram, 416 F.2d at 77-78 (citation and quotation omitted). A claimant can prove injury to competition either by (1) proving the relevant geographic and product markets and demonstrating the effects of the restraint within those markets, or (2) "show[ing] actual detrimental effects on competition such as output decreases or price increases caused by the restraint." Thurman Indus., 875 F.2d at 1373. West Coast chose to define the market and demonstrate the effect of the unreasonable restraint.
 
 
 18
 West Coast presented substantial evidence to support this element of the claim. West Coast points to the disparity in pay received by Balboa and Roland. Roland and the doctors were paid $400,000-$600,000 per year. In contrast, other outpatient facility medical directors were paid between $16,000 and $26,000. A full-time medical director, a defense expert witness, was paid only $80,000 per year. NMC could have solicited a full-time medical director for a fraction of the cost it paid pursuant to the contract with Balboa and Roland. However, outsiders were precluded from becoming medical directors for NMC because NMC would lose the doctors' large referral base. In order to preclude competition from the doctors, NMC was willing to negotiate a more lucrative contract for the doctors. Pursuant to the new contract, the doctors received 50% of the profits of NMC's facilities, plus the doctors' share of the overhead expenses was capped, resulting in a savings of over $600,000 per year.
 
 
 19
 West Coast also demonstrated a disparity in the number of acute dialysis businesses competing in San Diego and other California cities. Only two dialysis services companies were competing in San Diego County, but approximately 50 were operating in the Orange County area.
 
 
 20
 NMC attempted to recoup revenue lost in hospitals which West Coast was servicing because, as was noted by an NMC administrator, "our doctors will be trying to admit patients to our contracted hospitals rather than West Coast's hospitals (Sharp, Bay General, and Paradise Valley)." NMC's administrator also noted that "we will not be admitting our elective patients to Sharp Hospital (where West Coast is now providing service)." West Coast backs these statements with statistical data showing that dialysis treatments at Sharp Cabrillo increased from 70 in 1984 to 288 in 1985 (a total of 218 more treatments). The figures also show that dialysis at Sharp Memorial dropped from 1,084 in 1984 to 848 in 1985 (a decrease of 236). These figures support the inference the doctors, pursuant to an agreement with NMC, moved their "elective" patients to Sharp Cabrillo, impacting West Coast's business.
 
 
 21
 The doctors had the power to refer patients to a particular hospital and thereby affect competition. Outsiders would be precluded from entering the acute dialysis business because NMC and the doctors created effective barriers to entry. Sufficient evidence was presented for the jury to conclude that NMC's agreement with the doctors unreasonably affected trade in the relevant geographic market. Therefore, the district court did not err, as alleged by NMC, in refusing to grant a judgment notwithstanding the verdict on this claim.
 
 C. Sherman Act--Section 2
 
 22
 A claimant attempting to prove attempted monopolization under Section 2 of the Sherman Act must demonstrate: "(1) specific intent to control prices or destroy competition; (2) predatory or anti-competitive conduct directed toward accomplishing that purpose; (3) a dangerous probability of success; and (4) causal antitrust injury." Morgan, Strand, 924 F.2d at 1491 n. 8 (quotation and citation omitted).
 
 
 23
 (a) Specific Intent
 
 
 24
 Intent has sufficiently been shown through a combination of NMC's market share (at one time 100%) and the threats to put West Coast out of business or to regain NMC's hospital contracts. Specific intent to monopolize can be inferred from a defendant's threats to destroy plaintiff's business in combination with a dominant share of the relevant market. See Thurman Indus., 875 F.2d at 1379; Syufy Enters. v. Am. Multicinema, Inc., 793 F.2d 990, 999 (9th Cir.1986), cert. denied, 479 U.S. 1031, 1034 (1987). Further, NMC attempted to retain the doctors' services as medical directors by offering them high compensation for minimal work in an attempt to maintain the high level of referrals to its facilities and thereby abolish West Coast as a competitor and regain their ability to dictate price.
 
 
 25
 (b) Dangerous Probability of Success
 
 
 26
 NMC argues that the district court's refusal to grant a permanent injunction prohibiting the contractual relationship supports an inference that there is no probability of a continued monopoly. This argument is meritless. An injunction was denied because West Coast had failed to prove that NMC and the doctors had caused it irreparable injury; this factor is unrelated to the nature of NMC and the doctors' actions. Also, the "morality" of a doctor's interest in a recommended treatment was debated in the medical community and would make the district judge cautious in enjoining the contractual relationship.
 
 
 27
 NMC argues that because the jury found no actual monopolization, it should follow that NMC did not intend to attempt monopolization of the market. Actual monopolization requires possession of monopoly power in addition to the willful acquisition or maintenance of that power. Morgan, Strand, 924 F.2d at 1491. While NMC may have obtained its monopoly power without willful acquisition, thereby precluding an actual monopolization claim, the jury could have reasonably found that NMC's conduct subsequent to West Coast's entry into the market was designed to destroy West Coast and regain its monopoly power and that their actions had a high potential for success. Substantial evidence supported the verdict, thus NMC was not entitled to a judgment notwithstanding the verdict.
 
 D. Pendent Claim
 
 28
 West Coast successfully asserted a claim for intentional interference with prospective economic advantage. To prove this cause of action, West Coast must demonstrate
 
 
 29
 the existence of either a contractual relationship or a prospective business relationship advantageous to them, that defendants had knowledge of the advantageous relationship, that defendants intentionally or negligently induced the breach of the relationship, that the acts or conduct of the defendants were wrongful, and proximately caused plaintiff's injury and damage by interfering with the relationship causing a business loss.
 
 
 30
 Bert G. Gianelli Distrib. Co. v. Beck & Co., 172 Cal.App.3d 1020, 1053, 219 Cal.Rptr. 203 (1985) (quotation omitted).
 
 
 31
 NMC and the doctors summarily argue that "NMC was a competitor merely attempting to secure business for itself." NMC correctly notes it was appropriate for NMC to match West Coast's bids without anticompetitive ramifications. However, NMC has failed to specifically allege a lack of proof as to any of the required elements of the pendent claim. The jury was presented with sufficient evidence to demonstrate that NMC and the doctors were aware of West Coast's existing or contemplated contracts with San Diego hospitals, that they collusively acted with the intent to deprive West Coast of business relationships, and that such actions resulted in the loss of expected dialysis contracts.
 
 2. SPECIAL VERDICT FORM
 
 32
 NMC argues that the district court erred in refusing to present the jury with its proposed special verdict form.
 
 
 33
 According to Fed.R.Civ.P. 49(a), the trial court's complete discretion as to whether a special or general verdict is to be returned extends to determining the form of the verdict and interrogatories, provided that the questions asked are adequate to obtain a jury determination of all factual issues essential to judgment.
 
 
 34
 Carvalho v. Johns-Manville Sales Corp. (In re Hawaii Federal Asbestos Cases), 871 F.2d 891, 894 (9th Cir.1989). The special verdict responses must be reconciled with any reasonable theory consistent with the evidence. Id.
 
 
 35
 NMC does not challenge the adequacy of the jury instructions, but alleges the jury was not required to reconcile each material issue of fact when completing the special verdict form. We review the claimed error in light of the assumption that "juries act in accordance with the instructions given them." City of Los Angeles v. Heller, 475 U.S. 796, 798 (1986); see also Lange v. Penn Mutual Life Ins. Co., 843 F.2d 1175, 1184 (9th Cir.1988) ("absent a contrary finding, it must be assumed the court's instructions were followed"). Because the jury was properly instructed, we must determine if the jury determined each factual issue relevant to the verdict.
 
 
 36
 NMC argues the special verdict was deficient because it did not ask whether competition was restrained. The verdict form asked whether the defendants had conspired to "restrain trade or commerce." This is sufficient to present the jury with the issue. NMC argues the jury did not have to determine whether the relevant geographic market was established. Although a specific question was not asked regarding the relevant geographic market, the jury was instructed on this issue[7] and we infer that the instructions were accurately followed.
 
 
 37
 NMC argues it had a defense to liability because its conduct was consistent with permissible competition, but the jury was not required to consider it when arriving at the verdict. NMC sought to ask the jury whether the restraint of competition was "inconsistent with legitimate and logical competitive objectives." The district court did not include this question on the special verdict form, but it did instruct the jury that if it found the restraint had a harmful effect on competition it should "weigh any effects of the disputed practice which are helpful to competition against any harmful effects," and that it must consider whether the practice was necessary to effectively compete. The jury was adequately instructed on the defense. We presume these instructions were accurately applied by the jury in arriving at its conclusion that the antitrust provisions were violated.
 
 
 38
 NMC alleges that the district court eliminated every comment of attempted monopolization in structuring the special verdict form. Because the jury was adequately instructed on the elements of attempted monopolization, we conclude that the question "Did one or more defendants attempt to monopolize?" adequately presented all material issues to the jury for consideration.
 
 
 39
 NMC challenges the question "Did one or more defendants conspire to monopolize?" as lacking the elements of "knowingly and intentionally" conspiring, specific intent, and consideration of the defense of legitimate business activity. Again, the jury was adequately instructed on all elements of a conspiracy to monopolize claim, as well as the monopolization defenses. The special verdict form was sufficient to summarize the findings of the jury on each of the instructed elements.
 
 
 40
 NMC likewise challenges the special verdict's question of whether defendants intentionally interfered with prospective economic advantage. It alleges that the jury did not need to decide whether the defendants knew of the relationship. However, the jury was instructed that knowledge of the relationship was necessary. The district court also instructed the jury regarding the defense of justification. We presume the jury applied all instructions, including the applicability of the defense, before arriving at the conclusion that there was intentional interference.
 
 3. PUNITIVE DAMAGES
 
 41
 West Coast's pendent claims for unfair competition and tortious interference with prospective advantage are dependent for definition upon the law of California. We review the district court's interpretation of state law de novo. Matter of McLinn, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc).
 
 A. Directed Verdict
 
 42
 NMC argues that the district court erred in refusing to grant a directed verdict in its favor on the issue of punitive damages. A directed verdict can be granted by the trial court if "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue...." Fed.R.Civ.P. 50(a). NMC argues that the district court was not convinced that clear and convincing evidence existed of oppression, fraud or malice, pursuant to Cal.Civ.Code § 3294(a) (West 1991).
 
 
 43
 The district judge, when questioned by NMC about his ruling, noted that he did not think the evidence was clear and convincing. The judge went on to state four times, however, that sufficient evidence had been presented to convince a reasonable jury, applying the clear and convincing evidence standard, that punitive damages could be awarded. Because the evidence presented up to that point reasonably supported West Coast's claim to punitive damages and the district court applied the correct evidentiary standard, no error has been shown in the denial of a directed verdict in favor of NMC and the doctors.
 
 B. Bifurcation
 
 44
 NMC and the doctors argue that the district court erred in refusing to bifurcate evidence of their financial condition from the determination of liability pursuant to Cal.Civ.Code §§ 3294 and 3295. The district court determined that section 3295(d) was procedural and was therefore not applicable in federal court.
 
 
 45
 West Coast notes that Fed.R.Civ.P. 42(b) normally controls the bifurcation of issues or claims in federal court. Balboa argues that because it (and the individual doctors) were "subjected to greater exposure to liability" as compared to a proceeding in a California state court, section 3295(d) should have been applied by the district court. It also argues that the California legislature intended to make the order of proof part of the remedy of punitive damages.
 
 
 46
 We choose to follow other circuits in concluding that Rule 42(b) is procedural. The Sixth Circuit has noted that
 
 
 47
 Rule 42(b) under which the challenged separation of issues was ordered, was adopted pursuant to the Rules Enabling Act, 28 U.S.C. § 2072, as a regulation of the "practice and procedure" of district courts in diversity as well as other cases. Procedural labels, of course, do not foreclose inquiry into the possible "substantive" impact of a federal rule on a particular situation within the meaning of the rule requiring deference to state law announced in Erie R.R. v. Tompkins and subsequent cases. But we feel that the importance of maintaining uniform procedure in federal trials calls for a clear showing of possible substantive impact before departing from the federal rules.
 
 
 48
 Moss v. Associated Transport, Inc., 344 F.2d 23, 27 (6th Cir.1965) (citation omitted). The court went on to note that the separation of the determination of damages from the issue of liability did not present a situation where a different outcome assuredly would have occurred, therefore the party had failed to show a "substantive" impact. Id.; see also Lumbermens Mutual Casualty Co. v. Bell, 289 F.2d 124, 125-26 (5th Cir.1961) (validity of a release did not need to be tried separately, as required by Louisiana law, because severance is a procedural matter governed by federal law); Arthur Young & Co. v. United States Dist. Court, 549 F.2d 686, 697 (9th Cir.) (separation of the trial on individual damage issues from the class trial in securities fraud is within the scope of discretion under Fed.R.Civ.P. 42(b)), cert. denied, 434 U.S. 829 (1977).
 
 
 49
 Balboa claims that there was "a legislative finding implicit in the enactment of this statute that such evidence ... will prejudice the determination process regarding the liability predicate for punitive damages." This claim alone, however, is not enough to make the provision substantive. See Moss, 344 F.2d at 27.
 
 
 50
 We are not convinced that utilization of the state law would surely have created a different outcome, see Guaranty Trust Co. v. York, 326 U.S. 99, 111 (1945) (statute of limitations is substantive because application of state law would bar the action, whereas federal law would allow the action to survive), therefore no substantive impact has been shown. Section 3295(d) dictates the procedure for enforcing the right to punitive damages recognized by substantive law.[8] We conclude that, although California law would have required severance of the determination of damages from liability, Fed.R.Civ.P. 42(b) is procedural in nature and is applicable to the federal proceeding involving pendent state claims.
 
 
 51
 Rule 42(b) "gives a district court broad discretion.... A district court's decision regarding severance may be set aside only for abuse of discretion." Davis v. Mason County, 927 F.2d 1473, 1479 (9th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 275 (1991). No abuse of discretion was shown in presenting proof relevant to damages in combination with proof of liability.
 
 C. Jury Instruction
 
 52
 NMC argues the district court erroneously instructed the jury that punitive damages were available for all of West Coast's pendent claims. NMC argues punitive damages are unavailable for unfair competition claims brought pursuant to Cal.Bus. & Prof.Code §§ 17200 et seq.
 
 
 53
 NMC cites Dean Witter Reynolds, Inc. v. Superior Court, 211 Cal.App.3d 758, 774, 259 Cal.Rptr. 789 (1989) (a plaintiff can only recover the equitable remedy of restitution, not compensatory damages, in an unfair competition claim pursuant to Cal.Bus. & Prof.Code § 17200 et seq.) and Indus. Indem. Co. v. Superior Court, 209 Cal.App.3d 1093, 1096, 257 Cal.Rptr. 655 (1989) (a private litigant is allowed only injunctive relief and not damages under the unfair competition laws), to support its argument. The Dean Witter court noted the objective of the unfair competition provisions was to "provide a streamlined procedure for the prevention of ongoing or threatened acts of unfair competition." 211 Cal.App.3d at 774 (second emphasis added). The rationale behind allowing only injunctive relief and restitution would also prohibit the award of punitive damages. West Coast did not even attempt to argue in its brief, or at oral argument, that California law permits damages for unfair competition. In fact, at oral argument, West Coast conceded that it does not.
 
 
 54
 Instruction No. 111 stated: "Punitive or exemplary damages cannot be awarded for violations of the antitrust laws, Sections 1 and 2 of the Sherman Antitrust Act. On all other claims brought by plaintiff and on all counterclaims brought by defendant National Medical Care punitive damages may be awarded under certain circumstances."[9] This instruction created error in the award of punitive damages because it told the jury that West Coast was entitled to punitive damages on all pendent claims. West Coast was only entitled to restitution and an injunction for violations of California's unfair competition provisions. The special verdict form solidified the error by grouping all pendent claims together by asking: "What punitive damages, if any, for malice, oppression, or fraud on the pendent claims do you award against each defendant?"
 
 
 55
 West Coast was successful on its pendent claims for intentional interference with prospective economic advantage (San Diego area hospitals) and unfair competition. It is impossible for us to allocate the punitive damage award between the unfair competition claim, upon which punitive damages are not available, and the intentional interference claim. We therefore conclude that the award of punitive damages must be reversed due to a failure to properly instruct the jury and to bifurcate the pendent claim punitive damage question on the special verdict form.
 
 4. PREJUDICIAL EVIDENCE
 
 56
 NMC and Balboa argue the district court allowed West Coast to introduce highly prejudicial evidence. We review evidentiary rulings for an abuse of discretion, and will not reverse unless prejudice is demonstrated. Roberts v. College of the Desert, 870 F.2d 1411, 1418 (9th Cir.1988).
 
 
 57
 NMC and Balboa argue West Coast improperly focused on issues which are debated in the medical community. NMC and Balboa focus on evidence relating to (1) reuse of dialyzer filters, (2) problems with NMC's equipment before West Coast began competing with it (e.g., old, noisy, leaky, rusting, electrically hazardous, immobile, heavy, and "cannibalized" for parts), (3) the financial condition of NMC and the doctors, (4) lobbying activities engaged in by NMC, and (5) the morality of a proprietary interest in the treatment.
 
 
 58
 West Coast responds that: (1) reuse was relevant to (a) impeach the doctors, (b) show that once circumstances changed between the doctors and NMC, through execution of their contract, it created an incentive to save costs, and (c) show the parties' contractual relationship with Sharp Memorial because it was the first hospital to require reuse capacity of the contracting vendor, and (2) NMC's equipment and staff problems prior to West Coast's market entry were relevant to show that competition should have flourished due to consumer dissatisfaction and many hospitals were willing to change to West Coast to eliminate these problems. The financial condition of NMC and the doctors was relevant to the damages incurred by West Coast. Any argument regarding the morality of the proprietary interest in the treatment was counterbalanced by NMC's assertions to the contrary.
 
 
 59
 NMC and Balboa moved the court for a mistrial based on introduction of this evidence arguing that it was highly prejudicial and irrelevant. The district court denied the motion. Because each piece of evidence had a corresponding antitrust relevance, the district court did not abuse its discretion in admitting it.[10] Considering the volume of evidence presented to the jury, it is unlikely that any of these factors affected the outcome of the trial. We conclude that the district court did not abuse its discretion in admitting the evidence. NMC was not entitled to a mistrial based on these evidentiary rulings.
 
 5. ATTORNEYS' FEES
 
 60
 The district court awarded West Coast $775,834.80 in attorneys fees pursuant to 15 U.S.C. § 15 (1988). NMC argues that the fee was improperly calculated because (1) expert witness fees are not allowed, (2) the fees were not adequately documented, (3) the award included fees corresponding to prosecution of unsuccessful claims, and (4) the fees were unreasonable in amount. An award of attorneys' fees is reviewed for an abuse of discretion. Lange v. Penn Mutual Life Ins. Co., 843 F.2d 1175, 1184 (9th Cir.1988).
 
 
 61
 The district court balanced the twelve factors enunciated in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 69-70 (9th Cir.1975), cert. denied, 425 U.S. 951 (1976), and arrived at what it termed a "reasonable and proper rate." The court calculated the award as follows:
 
 
 62
 1,760.10 hrs Attorney--Rains
 - 23.10 hrs (Disallowed for work on state case)
 ---------------
 1,737.00 hrs
 x $ 150.00
 ---------------
 $260,550.00
 868.20 hrs Attorney--Price
 x $ 95.00
 ---------------
 $ 82,479.00
 2,077.90 hrs Attorney--Price
 x $ 115.00
 ---------------
 $238,958.50
 100.90 hrs Associate Attorney
 - 47.20 hrs (Disallowed for work on state case)
 ---------------
 53.70 hrs
 x $ 85.00
 ---------------
 $ 4,564.50
 256.10 hrs Paralegal
 x $ 40.00
 ---------------
 $ 10,244.00
 ---------------
 ---------------
TOTAL $596,796.00
 x 1.30 Multiplier based on evaluation of factors
 ---------------
 $775,834.80
 
 
 63
 The district court had time statements, although "somewhat imperfect," of all attorneys' fees incurred during the course of four years of litigation. The record indicates that West Coast presented a declaration of Price, an attorney in the case, detailing how the fees were incurred, and attached as exhibits were the billing statements. NMC has failed to credibly support its argument that the district court had insufficient information to calculate fees.
 
 
 64
 It becomes apparent from the calculations that the award of attorneys' fees was reasonable. The district court clearly excluded the hours it determined were spent in pursuing the state court action. Besides alleging that the fees were expended for non-antitrust purposes, NMC has failed to show an abuse of discretion in the calculation of attorneys' fees. The district court adequately articulated the "manner in which it ma[de] its determination of a reasonable hourly rate and the number of hours which should reasonably be compensated." Chalmers v. City of Los Angeles, 796 F.2d 1205, 1211 (9th Cir.1986), amended, 808 F.2d 1373 (9th Cir.1987).
 
 
 65
 The district court required all costs besides attorneys' fees to be determined by the court clerk in accordance with local rules. The fee request sought payment of $16,264 for expert witness fees, and NMC argues that "[t]he court made no deduction" for these disallowed fees. NMC objected in the district court to the expert witness fees claimed by West Coast. As a result of the objection, expert witness fees were omitted by West Coast in an amended fee request which was accepted by the clerk. The clerk assessed the total amount of recoverable costs at $25,004.59. This amount was affirmed by the district court. The only amount attributable to expert witnesses was the cost of airfare and daily per diem, totalling $1,919.70, which are the same costs received by an ordinary witness.
 
 
 66
 NMC argues that the district court improperly enhanced the fee award. A multiplier or enhanced fee award is limited to rare, exceptional cases. Chalmers, 796 F.2d at 1212. The district court analyzed many factors, including the partial contingent nature of the fee, to arrive at the conclusion that the situation called for a multiplier of 1.3. All of the factors considered were appropriate and do not point to an abuse of discretion.
 
 
 67
 NMC argues that the award of attorneys' fees essentially allows double recovery. West Coast argued to the jury that "to the extent that having to defend against NMC sham litigation, you can then take [attorneys' fees] into consideration in computing the antitrust damages to be awarded to plaintiff." The jury was instructed that attorneys' fees are not an element of damages, but that if West Coast incurred fees in defending sham state court litigation the fees may be considered in computing antitrust damages. The issue of whether the state court action was a sham justified introduction of evidence regarding prior attorneys' fees.
 
 
 68
 The damage award cannot substantially be linked to the evidence of prior attorneys' fees. The district court, referring to the jury instructions, determined that it had to assume the jury followed the instructions and awarded no fees for the antitrust award because "it is entirely reasonable to assume that no award was made on either claim by reason of the sham litigation." This interpretation is reasonable, thus we uphold the jury's damage award as separate and distinct from the award of attorneys' fees.
 
 
 69
 In addition to the costs of this lawsuit in the district court, West Coast seeks attorneys' fees on appeal. Because we uphold the Sherman Act verdicts, West Coast is entitled to attorneys' fees on appeal, pursuant to 15 U.S.C. § 15, in addition to the fees incurred in the district court. See Perkins v. Standard Oil Co. of California, 399 U.S. 222, 223 (1970). The district court shall determine on remand the amount of attorneys' fees incurred on appeal. Id.
 
 6. ELECTION OF REMEDIES
 
 70
 The district court determined that West Coast would be required to elect between its federal remedies and its state remedies. West Coast agrees that this was a proper determination. The district court then held that West Coast could receive attorneys' fees only if it elected the federal remedy and waived the state claims.
 
 
 71
 West Coast argues that the forced election should be between the punitive aspects of the award--treble damages v. punitive damages--instead of between the successful claims--antitrust damages v. pendent damages. Although West Coast's argument is creative, it is not a sound policy decision for the court to adopt. The Second Circuit, in addressing this election, determined that the award of a state remedy is complete in itself, but if attorneys' fees were an additional part of the state award it would result in a windfall to the plaintiff. Kelco Disposal v. Browning-Ferris Indus., 845 F.2d 404, 410 (2nd Cir.1988), aff'd, 492 U.S. 257 (1989) (court of appeals judgment affirmed on the ground that neither federal common law nor the Excessive Fines Clause of the Eighth Amendment provide a basis for disturbing the jury's punitive damages award). The Second Circuit reasoned in Kelco that attorneys' fees awarded pursuant to 15 U.S.C. § 15 were an exception to the general rule of refusing an award of attorneys' fees. Kelco, 845 F.2d at 410. The court noted that the plaintiff in an antitrust action wears two hats--one as the private victim seeking redress for a violation of state law and the other as a "public defender of broad social objectives that cast it in the role of a surrogate enforcer of the federal antitrust laws." Id. at 411. From this perspective, the court determined that a plaintiff who chooses to pursue state remedies has "stepped outside its role as private attorney general, and thus should not come within the ambit of § 15." Id.
 
 
 72
 We follow the reasoning in Kelco and conclude that if West Coast elects to pursue its state remedies, the federal remedy of attorneys' fees does not follow the election.
 
 7. VERDICT AGAINST FOX
 
 73
 Balboa argues that Fox failed to file a notice of appeal. However, he did file a notice of appeal on January 20, 1989, challenging the verdict against him for breach of the covenant of good faith and fair dealing to NMC. Fox argues the verdict was not supported by "substantial evidence."[11] See Oltz, 861 F.2d at 1450. Fox failed to move for a directed verdict in the trial court, therefore, the sufficiency claim is reviewed for plain error. Larez v. City of Los Angeles, 946 F.2d 630, 645 (9th Cir.1991). We review the claim to determine if there was "any evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was committed which, if not noticed, would result in a manifest miscarriage of justice." Benigni v. City of Hemet, 879 F.2d 473, 476 (9th Cir.1988) (quotations omitted).
 
 
 74
 Fox argues that the only evidence presented at trial demonstrated that he was merely an investor in American Computech. NMC, however, presented adequate evidence to support the jury's verdict. Fox was a 50% shareholder in American Computech, conducting business as West Coast, NMC's competitor. Fox notes that he attended Wolford's recruitment meeting and demonstrated dialysis equipment because the person hired failed to show up. At this meeting, Fox not only demonstrated the equipment but stated he would be in charge of the technical aspects of West Coast. The meeting was advertised with a reference to West Coast's technical supervisor who had 10 years' experience; Fox understood the ad was referring to him.
 
 
 75
 NMC alleged that Fox flew to Chicago to examine equipment on behalf of West Coast while he was still employed by NMC, although Fox testified he was on vacation. NMC presented evidence that Fox was difficult to contact while at work. When confronted by Loren Macey, NMC's administrator, Fox stated he was starting another company.
 
 
 76
 We uphold the jury's verdict that Fox breached his duty of loyalty to NMC.
 
 III
 
 77
 We conclude that: (1) substantial evidence supported West Coast's verdicts on the Sherman Act and pendent state claims; (2) the special verdict form, in combination with the jury instructions, adequately submitted all material issues to the jury; (3) the district court correctly applied the clear and convincing evidence standard to the issue of punitive damages; (4) the district court was not required to bifurcate the wealth of NMC and the doctors from the liability evidence because Fed.R.Civ.P. 42(b), not California law, controls bifurcation of issues; (5) the district court erred in instructing the jury that punitive damages were available on the pendent claim for unfair competition and in reiterating the mistake in the special verdict form, requiring reversal of the award; (6) the district court did not abuse its discretion in awarding West Coast attorneys' fees; (7) the district court properly disallowed attorneys' fees awarded pursuant to 15 U.S.C. § 15 if West Coast elects to pursue its state remedies; and (8) NMC's verdict against Fox is supported by substantial evidence.
 
 
 78
 We AFFIRM in part, REVERSE in part, and REMAND for retrial on the issue of punitive damages on the state claim for intentional interference and/or for an election of remedies, and for calculation of attorneys' fees on appeal.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The district court did not identify who the "buyers" of the product were. NMC argues that regardless of whether the buyer is viewed as the patients actually receiving the dialysis treatments or as the acute care hospitals contracting for the services, West Coast has failed to show adequately a reduction in the number of alternatives available. Balboa argues that the consumer is the hospital. West Coast does not attempt to identify who the consumers of the dialysis product are. We do not need to decide who the buyer is because, under either approach, the relevant geographic market was adequately demonstrated. See Oltz, 861 F.2d at 1447 (citing Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2 (1984) (an exclusive contract can affect two different segments of the consumer economy--consumers of medical services and providers of the service))
 
 
 [2]
 The map of San Diego and Imperial Counties, contained in the Network Coordinating Counsel report, showed the concentration of dialysis facilities in central San Diego extending into the south bay area. Imperial County, on the other hand, had one dialysis facility which was far removed from the concentration center in San Diego. In addition, the number of patients living in the area, as compared to the number of patients treated in the same vicinity, support this conclusion
 
 
 [3]
 The reasonableness of a restraint is evaluated using either per se or rule of reason analysis. Thurman Indus., 875 F.2d at 1373. The enumerated elements are relevant to analysis of antitrust claims under the rule of reason. See id. West Coast did not prevail on any per se violations of Section 1
 
 
 [4]
 NMC attempts to minimize the fact there was an agreement between the parties by stating that it "merely evidences an agreement to serve as medical directors." Any agreement, however, can be a violation of the antitrust laws if the agreement is accompanied by the requisite intent and the effect is an unreasonable restraint of trade
 
 
 [5]
 At trial, NMC and the doctors attempted to compare their compensation agreement to profit-sharing plans utilized by hospitals to compensate radiologists. However, unlike other percentage agreements the hospital had with radiologists, dialysis services differ because the physician refers his own patients for treatment at the hospital and thereby would essentially receive a higher compensation and would have more control over market activity
 
 
 [7]
 In Gough v. Rossmoor Corp., 585 F.2d 381, 385 (9th Cir.1978), cert. denied, 440 U.S. 936 (1979), a case cited by NMC as mandating reversal, the court determined that a finding of the relevant market will be presumed in accordance with the judgment, but such a presumption cannot be made if sufficient evidence of the market was not presented. Because sufficient evidence was presented regarding the relevant geographic market, we can construe the verdict in accordance with the judgment. The jury was instructed that it had to find the "plaintiff has proved both a relevant product market and a relevant geographic market" before it could "consider the remaining elements" of the claims. The jury was instructed that if it found the plaintiff had not "prove[n] a relevant geographic market, then you must find for defendants and against plaintiff on this claim." Because the special verdict form was marked in favor of West Coast, we conclude that the jury found that West Coast had sufficiently proven the geographic market
 
 
 [8]
 Balboa states that "[t]he 1987 amendment ... was clearly an expression of a compromise regarding the preservation of the state created remedy of punitive damages, while insuring that the 'foreign, diverting and distracting' evidence of defendant's 'financial condition' would not be injected into the liability phase of the adjudication of the state created right." Balboa's statement appears to recognize that § 3295(d) is merely involved in the process of adjudicating a right, but does not in itself create a right
 
 
 [9]
 At oral argument, West Coast asserted that the instruction was "invited error." However, NMC continuously objected to utilization of the erroneous instruction. No improper conduct occurred
 
 
 [10]
 West Coast's attorney may have crossed the line when he stated in closing argument that the "practices have bordered certainly on malpractice." However, this sentence was minor in an argument that covered over one hundred pages and no prejudice could be connected to it
 
 
 [11]
 The court instructed the jury that NMC was required to prove:
 (1) the existence of a contract of employment at the time of the wrongful conduct; (2) that NMC performed all of its obligations pursuant to the contract; (3) that Fox, in bad faith, violated the duties; and (4) that NMC sustained damages.