**THURMAN INDUSTRIES, INC.,**
Plaintiff–Appellant,

v.

**PAY 'N PAK STORES, INC.,**
Defendant–Appellee.

**No. 87–4399.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 6, 1989.

Decided May 22, 1989.

Earle J. Hereford, Jr., Culp, Guterson & Grader, Seattle, Wash., for plaintiff-appellant.

Marvin L. Gray, Jr., Davis, Wright & Jones, Seattle, Wash., for defendant-appellee.

Before HUG, NORRIS and THOMPSON, Circuit Judges.

HUG, Circuit Judge:

This case presents multiple antitrust claims arising from defendant's purchasing and marketing practices in its operation of "home center" stores in the Seattle, Washington area. Plaintiff appeals the dismissal by summary judgment of its claims for conspiracy in restraint of trade and actual monopolization under Sherman Act §§ 1 and 2, and the stipulated dismissal of its attempted monopolization claim under Sherman Act § 2 following the district court's pre-trial order excluding certain evidence on the attempt claim. This appeal requires us to resolve two issues: whether plaintiff has raised a genuine issue of material fact as to the definition of the relevant product market that supports the conspiracy and actual monopolization claims; and whether the district court abused its discretion in excluding evidence on the attempted monopolization claim. We resolve both issues against the plaintiff and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The dispute underlying this lawsuit began after management discord forced Stan Thurman to resign as the chief executive officer of defendant Pay 'N Pak, Inc. ("Pay 'N Pak"). Later, Mr. Thurman founded plaintiff Thurman Industries, Inc. ("Thurman"), which became a competitor of Pay 'N Pak. Thurman and Pay 'N Pak

are retail chains operating "home center" stores, which sell tools, supplies, and other products for the building, electrical, and plumbing needs of individuals engaged in household remodeling and repair projects. Identical or competing brands of the products sold by home centers are available at hardware, specialty, or department stores and other retail vendors. The principal difference between home centers and other vendors lies in the wide variety of products offered by home centers and the presence of trained and knowledgeable home center sales staffs who can assist individuals with product selection and project implementation.

According to Thurman, Pay 'N Pak and Thurman were two of roughly seven to eight businesses in the Seattle area that offered the unique combination of goods and services characteristic of a home center during the period set out in the complaint. Pay 'N Pak operated twenty-five stores in the Seattle area and a total of 100 or more stores throughout sixteen states. Thurman operated a total of ten stores—six in Seattle and four in other Washington communities. Thurman's affidavits and exhibits identify Pay 'N Pak as having held the second-largest share (or 20 to 30 percent) of retail sales by home centers in Seattle and the largest share among buyers of home center merchandise because of Pay 'N Pak's practice of purchasing merchandise for all of its 100 or more stores through a single distribution point in Seattle. In contrast, Pay 'N Pak's affidavits and exhibits show that its share of retail sales in home improvement products sold by both home centers and all other vendors in the Seattle area was less than ten percent. The affidavits and exhibits of both parties agree that the share of sales of particular goods by home centers as opposed to other vendors varied with the type of product, tool, or supply being offered for sale.

Thurman's allegations against Pay 'N Pak focus on Pay 'N Pak's use of its size as a buyer of home improvement merchandise to secure competitive advantage in the market for retail sales by home centers. The allegations identify anticompetitive

conduct by Pay 'N Pak of three general varieties: (1) pressuring product suppliers and dealers to refuse to deal with Thurman, (2) predatorily pricing certain home improvement items, and (3) knowingly obtaining preferential pricing and other terms from various dealers and suppliers. This behavior, according to Thurman, violated Sherman Act § 1's prohibition against conspiracies in restraint of trade, Sherman Act § 2's ban of actual *or* attempted monopolization, and the Robinson–Patman Act. *See* 15 U.S.C. §§ 1, 2, 13 (1982). The complaint also alleges violations of state antitrust laws and state law business torts.

Following extended discovery by both parties, Pay 'N Pak sought summary judgment on all Sherman Act claims and some of Thurman's other claims not relevant to this appeal. The district court concluded that Thurman had failed, as a matter of law, "to establish a relevant product market for the purpose of assessing liability under the [Sherman Act]." As a result, the court granted summary judgment dismissing the actual monopolization claim and the claim for conspiracy in restraint of trade. The court concluded that the lack of triable issues on product market definition was not fatal to the attempted monopolization claim because Thurman had raised triable issues on its predatory pricing allegations, making market proof unessential to the attempt claim. Both parties moved for reconsideration, but the district court denied these motions insofar as they concerned the Sherman Act claims.

Thurman then moved for an order that evidence of Pay 'N Pak's conduct other than predatory pricing would be admissible on the issues of anticompetitive conduct and specific intent to monopolize at trial of the attempted monopolization claim. The district court found the evidence inadmissible largely because the alleged conduct was ambiguous in its anticompetitive nature and therefore impermissible as a basis for inferring intent. Following this ruling, Thurman stipulated that unless it obtained substantial reversal of the Sherman Act rulings on appeal, it would not try the attempted monopolization charge. The dis-

trict court then entered an order under Fed.R.Civ.P. 54(b) directing the entry of final judgment dismissing *all* Sherman Act claims and certifying that immediate appellate review of the Sherman Act rulings would facilitate ultimate disposition of the case.

## DISCUSSION

### I. *Conspiracy and Monopolization Claims; Sherman Act §§ 1 and 2*

The claims for conspiracy in restraint of trade and actual monopolization were dismissed by summary judgment. We review a grant of summary judgment *de novo* and evaluate the evidence most favorably to the non-moving party to determine whether any genuine issues of material fact remain and whether the district court correctly applied the relevant substantive law. *Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168, 1171 (9th Cir.1988). Although this circuit generally disfavors summary judgment in antitrust cases, it is appropriate when the non-moving party fails to present a record adequate to support a favorable finding. *Id.; see also California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 698–99, 98 L.Ed.2d 650 (1988).

### A. *The Need for Market Definition*

Sherman Act § 1 prohibits conspiracies and agreements that unreasonably restrain trade. 15 U.S.C. § 1 (1982); *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988). Courts evaluate the reasonableness of a restraint under either per se analysis or the rule of reason. *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1445 (9th Cir.1988). On appeal, Thurman abandoned its position that Pay 'N Pak's conduct was per se unlawful. Thus, we confine our analysis of the section 1 claim to the rule of reason.

■ To succeed under the rule of reason, a section 1 claimant must establish three elements: "(1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually restrains competition." *Id.* at 1445 (citing *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1391 (9th Cir.), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984)). After these elements are established, the factfinder must weigh the procompetitive and anticompetitive effects of the challenged restraint and thoroughly examine all of the surrounding circumstances to determine whether the restraint is unreasonable. *Id.*

■ Proving injury to competition ordinarily requires the claimant to prove the relevant geographic and product markets and to demonstrate the effects of the restraint within those markets. *Id.* at 1446; *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir.), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). Avoiding the need for such elaborate market analysis requires the claimant to show actual detrimental effects on competition such as output decreases or price increases caused by the restraint. *Oltz*, 861 F.2d at 1448 (citing *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460, 106 S.Ct. 2009, 2018–19, 90 L.Ed.2d 445 (1986)). Thurman has advanced no evidence showing clear competitive injury from any of Pay 'N Pak's alleged behavior. Thus, market analysis is essential to its conspiracy claim under section 1.

■ Market analysis is also essential to Thurman's monopolization claim under Sherman Act § 2, 15 U.S.C. § 2 (1982). Such a claim is composed of two elements: (1) the defendant's possession of monopoly power in the relevant market and (2) the defendant's willful acquisition or maintenance of such power. *Oahu Gas Serv., Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 363 (9th Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). As the language of the first element makes clear, defining the relevant market is indispensable to a monopolization claim. *See Greyhound Computer Corp. v. Interna-*

*tional Business Mach. Corp.,* 559 F.2d 488, 493–96 (9th Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). Because Thurman advances the same market definition in support of both the conspiracy and monopolization claims, we analyze the dismissal of both claims together.

### B. *Thurman's Proposed Market Definition*

Thurman's evidence of competitive injury relies upon a market defined as the greater Seattle region in geographical dimension and the complete package of commodities and services offered by home center stores in product dimension. Thurman argues that home center stores constitute a discrete product market because of their broad selection of building, plumbing, and electrical supplies for home remodeling projects and their trained sales staffs who can assist customers in product selection and job performance. Thurman maintains that this unique combination of goods and services allows do-it-yourself home remodelers and home repairers to obtain "everything they need" at one location. According to Thurman, this clustering or grouping of goods and services justifies isolating home centers as a separate product market.

Pay 'N Pak does not dispute Thurman's proposed geographic market but attacks the proposed product market as overly narrow. According to Pay 'N Pak, products offered in home center stores belong to numerous individual product markets that include any retail establishment offering a particular type of good whether or not it offers the full range of goods and services available at home center stores. Pay 'N Pak contends that Thurman offered insufficient evidence to support market isolation of home center stores from other retail establishments selling identical or similar products but with less comprehensive product mixes and selections.

■ For antitrust purposes, defining the product market involves identification of the field of competition: the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business. *Los Angeles Memorial Coliseum Comm'n,* 726 F.2d at 1392–93. This definitional process is a factual inquiry for the jury; the court may not weigh evidence or judge witness credibility. *Syufy Enter. v. American Multicinema, Inc.,* 793 F.2d 990, 994 (9th Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830; 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 838 (1987).

■ The goods and services that sellers or producers offer provide the best indicia of who competes in the same market. Thus, a product market is typically defined to include the pool of goods or services that qualify as economic substitutes because they enjoy reasonable interchangeability of use and cross-elasticity of demand. *Oltz,* 861 F.2d at 1446; *Syufy,* 793 F.2d at 994. In limited settings, however, the relevant product market may be narrowed beyond the boundaries of physical interchangeability and cross-price elasticity to account for identifiable submarkets or product clusters. *E.g., JBL Enter., Inc. v. Jhirmack Enter., Inc.,* 698 F.2d 1011, 1016–17 (9th Cir.), *cert. denied,* 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983); *M.A.P. Oil Co., Inc. v. Texaco, Inc.,* 691 F.2d 1303, 1306–07 (9th Cir.1982); *Greyhound Computer Corp.,* 559 F.2d at 493–94.

Pay 'N Pak has presented overwhelming evidence that for any given product sold at a home center, a functionally equivalent or identical product is available for purchase at several more specialized stores throughout the Seattle area. Pay 'N Pak's evidence also suggests significant consumer sensitivity to price fluctuations among the various vendors for any given product. Thurman has offered no evidence to counter this showing of economic substitutability between the products offered by home centers and the products of other retail vendors. Thurman has elected instead to rely upon either a submarket or a product cluster theory in order to confine the product market to home centers. We conclude Thurman's reliance is misplaced.

### 1. Submarket for Home Centers

■ The concept of identifying submarkets for antitrust purposes had its first exposition in *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed. 2d 510 (1962). There, the Supreme Court delineated several factors for consideration in the conduct of a submarket inquiry: whether industry or the public recognizes the proposed submarket as a separate economic entity; whether the products involved have peculiar characteristics or uses; whether unique production facilities are involved; and whether distinct customers, distinct prices, price change sensitivity, or specialized vendors highlight the proposed submarket.[1] *Id.* at 325, 82 S.Ct. at 1524. We have repeatedly noted that the *Brown Shoe* indicia are practical aids for identifying the areas of actual or potential competition and that their presence or absence does not decide automatically the submarket issue. *M.A.P. Oil*, 691 F.2d at 1307; *Kaplan,* 611 F.2d at 292; *International Tel. and Tel. Corp. v. General Tel. and Elec. Corp.*, 518 F.2d 913, 932 (9th Cir.1975) ("*ITT*"). Whether isolating a submarket is justified turns ultimately upon whether the factors used to define the submarket are "economically significant." *ITT,* 518 F.2d at 932.

In *Brown Shoe*, for instance, the Supreme Court upheld the trial court's finding that men's, women's, and children's shoes made up separate submarkets. 370 U.S. at 326, 82 S.Ct. at 1524. As indicia of these submarkets, the Court relied on the presence of separate manufacturing facilities, public recognition of separate submarkets, peculiar characteristics of each type of shoe, and distinct customer groups. *Id.* These factors were economically significant in identifying actual fields of competition simply because men do not normally buy women's or children's shoes for their own use and women and children exhibit parallel purchasing habits regarding shoes made for their respective groups.

*ITT,* 518 F.2d at 932–33 (interpreting *Brown Shoe*). This natural barrier insulated sales of each of the three types of shoes from competition with the others, and justified their division into separate submarkets. *Id.* at 933.

In contrast, we reversed a finding of separate submarkets in *ITT* because the presence of distinct customers and industry perception of a separate submarket lacked economic significance as to the actual field of competition. *ITT,* 518 F.2d at 932–33. Telephone manufacturers involved in that case sold identical equipment to independent telephone operating companies, to other industries, and to government; but the manufacturers regarded sales to the telephone operating companies as a distinct submarket, and the district court agreed. *Id.* at 932. In reversing, we identified as the only real difference between the groups of customers the likelihood that telephone operating companies would purchase in greater volume than other customers. *Id.* at 933. This difference, we concluded, did not justify completely excluding sales to government or non-telephone industries.

Thurman maintains that the record in this case offers evidence of four *Brown Shoe* factors that are economically significant enough to raise an issue of fact as to a submarket exclusively made up of home centers. First, Thurman submits that home center stores are *specialized vendors*. In support of this factor, Thurman relies on testimony by home center executives acknowledging the wide variety of building, electrical, and plumbing products and the presence of trained sales staffs at home centers as the distinguishing marks of the home center industry. Second, Thurman contends home centers cater to *distinct customers* called "do-it-yourselfers." In support of this factor, Thurman relies on testimony by home center executives explaining that the marketing goal of a home center is to ensure a sufficiently

---

**1.** Although *Brown Shoe* involved a claim under Clayton Act § 7, its submarket analysis is applicable in Sherman Act cases. *See Greyhound,* 559 F.2d at 494 n. 7. Such applicability follows because the same considerations essential to line of commerce analysis under the Clayton Act are essential to market analysis under the Sherman Act. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1270–71 (9th Cir.1975).

diverse product mix to enable "one-stop shopping." Third, Thurman argues home centers enjoy *industry recognition* as a discrete product market. In support of this factor, Thurman points to various trade publications and testimony by industry executives about trade shows devoted exclusively to retail merchandising in the home center format. Finally, Thurman contends home centers enjoy *consumer recognition* as a separate submarket. In support of this factor, Thurman relies on testimony supporting the second factor, an expert economist's affidavit, and various surveys indicating that consumers regard convenience as the most important factor in deciding where to purchase home repair and remodeling products.

The factors advanced by Thurman represent but two fundamental assumptions of fact: (1) that home centers are perceived as distinguishable from other stores by the variety of products and the trained sales staffs that home centers offer, and (2) that customers engaged in major home remodeling or home repair projects patronize home centers because of this distinction. But these factual assumptions, even if true, form an inadequate basis for concluding that home centers and other retailers lack the ability to attract substantial amounts of business away from each other. Stated more concretely, the factors identified by Thurman are wholly inadequate to allow a finding that specialty stores selling house paint are unable through price reductions or other marketing strategies to lure significant numbers of do-it-yourself builders into buying paint at a specialty store even if they purchase all their other supplies at a home center. This analysis applies with equal force to the marketing overlap of all other products sold both by home centers and by other retailers.

Moreover, Thurman's factors reveal nothing about the purchasing proclivity of countless do-it-yourself customers engaged in simple repairs rather than major projects and needing only one or two items to complete the job. Much of the evidence in the record suggests that sales to such customers constitute a large portion of all home center sales and that specialty or department stores compete vigorously with home centers for sales to such customers. In short, the factors advanced by Thurman do not exhibit an economically significant barrier to customer cross-over similar to the pattern of gender and age-based purchasing at issue *Brown Shoe*. Instead, Thurman's factors resemble the factors in *ITT*, which revealed little about the actual field of competition. Without a showing of the role that industry and public perception, distinct customers, or specialized vendors play in motivating and shaping consumer decisions, the demarcation of a submarket from within the pool of producers and sellers who supply economic substitutes cannot be justified.

Our rejection of a submarket for home centers based on the record before us is consistent with *Photovest Corp. v. Fotomat Corp.*, a case on which Thurman heavily relies. 606 F.2d 704 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980). In affirming a product market definition that included drive-thru film processing and excluded the identical services offered by drug stores and other conventional retailers, the *Photovest* court noted the presence of specialized vendors and public and industry perception of a submarket. 606 F.2d at 713–14. The court's analysis, however, designated the ability of drive-thru vendors to charge 20 percent more than other retailers as pivotal to the result. This price differential reflected a low cross-price elasticity between drive-thru vendors and others and added significance to the public's perception of a separate submarket because the differential reflected consumer willingness to pay a premium for photo processing in the drive-thru format. *Id.* Stated another way, the price differential furnished the economic significance in *Photovest* that Thurman's evidence has failed to furnish here.

We also pause to note that our analysis here is consistent with *California v. American Stores, Inc.*, where we recently upheld the district court's definition of grocery supermarkets as a submarket exclusive of convenience stores, "mom and pop" grocery stores, gas stations, delis, bakeries

and other vendors which sell many of the same food products that supermarkets carry. 872 F.2d 837, 840 (9th Cir.1989). The record in *American Stores* suggested that consumers have periodic grocery shopping needs and that supermarkets are the only retailers that compete to meet those needs. *Id.* We emphasized, however, the deferential nature of our review of the preliminary injunction at issue in *American Stores* and expressed some reservation that a similar result would have obtained under a more searching review at later stages in the litigation. *Id.* at 840. In this case, our independent review of the record does not suggest the frequency of consumer's home improvement purchasing needs nor that consumers are unwilling to patronize a variety of retailers other than home centers in meeting those needs. The record simply fails to raise a factual issue under Thurman's submarket theory that requires resolution by a factfinder.

**2. Product or Service Cluster**

▪ As an alternative to the submarket approach heralded in *Brown Shoe,* Thurman contends that a home center's mix of home improvement supplies and trained sales advice could be viewed by consumers as a single cluster of goods and services constituting a unitary product unavailable outside of home centers. According to Thurman, the possibility of such consumer-perceived clustering is sufficient to raise a genuine issue of material fact as to a home center product market definition. We need not dwell on this argument, for the same weaknesses in Thurman's submarket analysis afflict its attempt to rely on a cluster of home improvement goods and services as the relevant market.

"[A] cluster approach is appropriate where the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately." *JBL Enter., Inc. v. Jhirmack Enter., Inc.,* 698 F.2d at 1016–17 (sales of entire lines of shampoos and conditioners sold to wholesalers held to constitute relevant product market because wholesalers typically purchase an entire line rather than products individually); *see*

*also United States v. Phillipsburg Nat'l Bank & Trust Co.,* 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970) (cluster of services offered by commercial banks held to be the relevant product where savings banks could not offer the full compliment of banking services and depositors were aided in obtaining loans from a commercial bank by patronizing the same institution for a variety of financial services). Thurman maintains that the convenience of one-stop shopping and the presence of trained sales staffs at home centers appeal to consumers on a different level than the products individually. However, home centers do not offer products that customers cannot purchase at specialty stores or general department store chains. And, as we noted above, the record is inadequate to support a finding that consumers—even those engaged in major home remodeling projects as opposed to simple repairs—are lured to home centers and away from specialty vendors or department stores solely because of the home center product and service package.

As a result, Thurman cannot rely on a cluster approach or submarket theory in order to show the existence of a genuine issue of material fact as to its proposed product market. In the absence of such an issue, the record is insufficient to support a finding that Pay 'N Pak possessed monopoly power in the market in which home centers compete or that Pay 'N Pak's merchandising activity unreasonably restrained trade in that market. The district court therefore appropriately entered summary judgment dismissing Thurman's conspiracy and monopolization claims.

**II. *Attempted Monopolization; Sherman Act § 2***

Dismissal of the attempted monopolization claim was precipitated by the district court's pre-trial order holding Thurman's evidence of conduct by Pay 'N Pak other than predatory pricing to be inadmissible on the attempted monopolization claim. Following this evidentiary ruling, Thurman stipulated that it would not try the claim unless the ruling was reversed on appeal;

the district court then ordered dismissal and certification of the claim under Fed.R. Civ.P. 54(b). The pre-trial evidentiary ruling therefore frames our review of the order dismissing Thurman's attempt claim. We review district court decisions on the admissibility of evidence only for abuse of discretion. *Coursen v. A.H. Robins Co.,* 764 F.2d 1329, 1333 (9th Cir.1985). A district court abuses its discretion by basing its decision on clearly erroneous factual findings or by applying an incorrect legal standard. *SEC v. Carter Hawley Hale Stores, Inc.,* 760 F.2d 945, 947 (9th Cir. 1985).

### A. *Elements of Attempted Monopolization*

■■■ An attempted monopolization claim under Sherman Act § 2, 15 U.S.C. § 2 (1982), has three essential elements: (1) specific intent to control price or eliminate competition; (2) anticompetitive conduct directed at accomplishing the unlawful objective; (3) and a dangerous probability of success. *Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 736 (9th Cir. 1987). Although the elements are stated individually, this circuit has recognized interrelationships among them that obviate the need for direct proof of one or more of them. Thus, specific intent under the first element may be inferred from conduct under the second element, but only if the conduct is predatory or clearly in restraint of competition such as a per se violation under section 1. *Blanton v. Mobil Oil Corp.,* 721 F.2d 1207, 1214 (9th Cir.1983), *cert. denied,* 471 U.S. 1007, 105 S.Ct. 1874, 85 L.Ed.2d 166 (1985); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1028 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). A dangerous probability of success under the last element may also be inferred from conduct that could support an inference of intent or from direct evidence of specific intent plus proof of conduct directed toward accomplishing the unlawful goal. *William Inglis,* 668 F.2d at 1029; *Pacific Coast Agr. Export Ass'n v. Sunkist Growers,* 526 F.2d 1196,

1205 (9th Cir.1975), *cert. denied* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976).

■■■ Although proof of a defendant's power in the relevant market is not listed as an essential element of an attempt claim, such proof is relevant and often critical. In the absence of the type of conduct from which specific intent or a dangerous probability of success may be inferred, an attempt claimant must establish the relevant market and the defendant's market power. *M.A.P. Oil,* 691 F.2d at 1309. Market analysis is essential because intent to exclude competition or control prices cannot exist in vacuum; such intent may exist only within the framework of a definable market. *Id.; Blanton,* 721 F.2d at 1214. Market analysis is also highly probative of whether anticompetitive conduct threatens a dangerous probability of raising price and excluding competition. *William Inglis,* 668 F.2d at 1029.

The evidence Thurman wanted admitted showed that Pay 'N Pak coerced manufacturers, wholesalers, and their sales representatives into refusing to sell home improvement products to Thurman; knowingly obtained lower supply prices than were available to competitors; and intentionally interfered with Thurman's business relationships. The district court held this evidence inadmissible because Thurman failed sufficiently to support its proposed product market definition. Without evidence of Pay 'N Pak's alleged power in the relevant market, the court reasoned, Thurman could only establish specific intent through inferences drawn from predatory conduct or a per se restraint under Sherman Act § 1. The court concluded Thurman's evidence of conduct other than predatory pricing failed to qualify as an appropriate basis for inferring intent and should therefore be excluded at trial. On appeal, Thurman argues that the district court abused its discretion because the evidence held inadmissible was highly probative of both the intent and conduct elements of attempted monopolization.

### B. *Specific Intent*

■■■ Thurman first contends that the district court abused its discretion by con-

cluding that the conduct Thurman desired to explore at trial was not predatory or per se illegal and could not support an inference of specific intent to monopolize. This argument has no merit. Of Pay 'N Pak's various activities held inadmissible by the district court, only the allegedly coerced refusals to deal resemble per se illegality under Sherman Act § 1. The per se rule may apply to refusals to deal only when implemented by a conspiracy among horizontal actors, or market participants who occupy the same level in the chain of production or distribution. *E.g., Harkins v. Amusement Enter., Inc. v. General Cinema Corp.,* 850 F.2d 477, 486 (9th Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 817, 102 L.Ed.2d 806 (1989). When the conspirators are vertical actors, a concerted refusal to deal must be analyzed under the rule of reason. *Business Elec. Corp. v. Sharp Elec. Corp.,* 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Here, any concerted refusal to deal with Thurman resulted from vertical arrangements between Pay 'N Pak and entities further up the chain of distribution. Accordingly, the evidence of conduct Thurman proposed to introduce at trial indicates no per se violation by Pay 'N Pak.

Rather, the conduct held inadmissible reflects the type of behavior among business rivals that conforms to Sherman Act proscriptions as long as the market is competitive and market power widely dispersed. Divorced from market considerations, conduct that harms a business rival cannot be labeled as predatory or clearly anticompetitive because the goal of prevailing against all competitors is the very essence of a competitive marketplace. *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 670 (9th Cir.1980). In the absence of properly supported market analysis, the conduct Thurman wanted to have introduced fails to exhibit more than aggressive behavior among intense competitors. Thus, the district court did not abuse its discretion in finding the conduct inappropriate as a basis for inferring specific intent to monopolize.

Thurman next contends that some of the conduct held inadmissible was direct rather than circumstantial evidence of intent to monopolize and therefore immune to the limitations on evidence admissible to show intent in the absence of market proof. In particular, Thurman argues that alleged verbal threats by Pay 'N Pak's chief executive officer to "run Thurman out of business" are direct evidence of intent to control prices and exclude competition. These threats may constitute direct evidence of Pay 'N Pak's desire to harm Thurman. But such a desire cannot be equated with intent to monopolize in the absence of market proof. The significance of these alleged threats that were directed at a single business rival could only be to provide a basis for inferring Pay 'N Pak's intentions with respect to the entire marketplace. *See Syufy,* 793 F.2d at 999. Thus, we see no rational basis for distinguishing between the admissibility of the threat and the admissibility of the other conduct on the issue of intent to monopolize.

Thurman attempts to bolster his argument by relying on *Syufy,* where we permitted the jury to infer specific intent to monopolize from the defendant's threat to run plaintiff's business out of town. 793 F.2d at 999. *Syufy,* however, offers no support for Thurman's argument because the plaintiff in that case proved that the defendant who made the threat had the dominant share of the relevant market. *See Id.* at 994–96. As a result, the restrictions on the type of evidence from which specific intent may be inferred were not even at issue in the case.

### C. *Conduct*

Thurman also contends the district court abused its discretion because the evidence held inadmissible was relevant to the second element of an attempt claim: anticompetitive conduct directed toward realizing monopoly power. Thurman maintains that because a wide range of behavior may be introduced to prove the anticompetitive conduct element, the evidence should not have been held inadmissible. In response, Pay 'N Pak argues that without a showing of Pay 'N Pak's power in the relevant

market, Thurman's evidence was properly held inadmissible because the conduct was not unambiguously anticompetitive. We conclude the district court could appropriately bar the evidence from trial even if it bore some relevance to the conduct element of an attempt claim.

A district court has the power to exclude otherwise admissible evidence where "the danger of unfair prejudice, confusion of the issues, or misleading the jury" substantially outweighs the probative value of the evidence. Fed.R.Evid. 403. In balancing probative value against prejudicial harm, district courts enjoy wide latitude. *Hill v. Rolleri,* 615 F.2d 886, 890 (9th Cir.1980); *see also Palmerin v. City of Riverside,* 794 F.2d 1409, 1411 (9th Cir.1986).

As we explained above, Pay 'N Pak's alleged behavior aimed at harming Thurman was only ambiguously anticompetitive in the absence of properly supported market analysis. Moreover, whether the evidence was admitted or excluded, Thurman would have been required to establish its predatory pricing allegations in order to show the element of specific intent to monopolize. But a showing of predatory pricing would have established the conduct element as well. Thus, the evidence held inadmissible was somewhat cumulative and only modestly probative of the conduct needed for attempted monopolization.

On the other side of the Rule 403 equation, however, the evidence held inadmissible threatened to confuse the issues or mislead the jury. That evidence depicted a large corporation potentially harming a smaller rival through aggressive behavior. In deciding whether to infer specific intent to monopolize from evidence of predatory pricing, a jury could have been strongly influenced by evidence of Pay 'N Pak's other aggressive behavior—behavior forbidden as a basis for inferring intent to monopolize. The district court could reasonably decide that this danger of improper influence on the intent element substantially outweighed Thurman's less-than-compelling need for introduction of the evidence on the conduct element. Consequently, the exclusion of the evidence was not an abuse of discretion.

## CONCLUSION

Defining the relevant product market solely to include home centers was essential to Thurman's claims for conspiracy in restraint of trade and monopolization under Sherman Act §§ 1 and 2. The district court appropriately granted summary judgment dismissing those claims because Thurman failed adequately to raise a genuine issue of material fact under its submarket or product cluster theories of the relevant product market. Thurman's failure adequately to support its product market definition also rendered evidence of Pay 'N Pak's conduct other than predatory pricing inadmissible as a basis for proving specific intent to monopolize. The district court properly exercised its discretion in ordering the evidence entirely inadmissible on Thurman's claim for attempted monopolization under Sherman Act § 2. As a result, Thurman has failed to establish grounds for reversal of any part of the order dismissing the Sherman Act claims, and that order is AFFIRMED.