CYNTEGRA, INC.

v.

IDEXX LABORATORIES, INC.

No. CV 06–4170 PSG (CTx).

United States District Court, C.D. California.

Oct. 25, 2007.

1202

Saralynn Mandel, Mandel and Adriano, Pasadena, CA, for Cyntegra, Inc.

Craig P. Seebald, McDermott Wil and Emery, Washington, DC, Robert P. Mallory, McDermott Will & Emery, Los Angeles, CA, William Diaz, McDermott Will & Emery, Irvine, CA, for Idexx Laboratories, Inc.

PHILIP S. GUTIERREZ, District Judge.

**Proceedings: In Chambers Order GRANTING Defendant's Motion for Summary Judgment**

■ Presently pending before the Court is Defendant Idexx Laboratories, Inc.'s ("Idexx" or "Defendant") Motion for Summary Judgment. After considering the parties' papers and oral argument at the hearing on October 22, 2007, the Court GRANTS Defendant's Motion.[1]

---

1. Defendant also requests that the Court take judicial notice of Exhibits A–J. The Court GRANTS Defendant's request. These exhibits are all copies of court documents, and are thus are the proper subject of judicial notice. See *Holder v. Holder,* 305 F.3d 854, 866 (9th Cir.2002).

## I. *BACKGROUND*

Defendant develops and sells a variety of products used by veterinarians to diagnose and treat illnesses in companion animals, including analyzers used to test specimens in-clinic, pharmaceuticals and reference laboratory services. (Defendant's Statement of Undisputed Facts, "UF," UF, ¶¶ 2, 4–6.)[2] Defendant's in-clinic rapid assay tests, or SNAP® tests, allow veterinarians to test the animals and receive results while the animals and their owners are present at the appointment. (UF, ¶¶ 5–7.) Defendant also offers diagnostic services through Idexx Reference Laboratories, a worldwide network of laboratories. (UF, ¶ 8.) These laboratories send collection kits directly to veterinarians, who collect samples and submit them back to Defendant for analyses. (UF, ¶¶ 10–11.)

Plaintiff Cyntegra, Inc. ("Cyntegra") claims it has developed innovative animal diagnostic products that permit the rapid and sensitive detection of one or more pre-selected target substances in a single biological sample from an animal, using genomic or "molecular diagnostic methods." (FAC, ¶ 12.) Plaintiff alleges that its diagnostic tests include a panel of multiple animal pathogens for each companion animal. (Plaintiff's Statement of Genuine Issues "SGI," ¶ 13.) Plaintiff further alleges its molecular based diagnostic products are considered equivalent or superior to animal diagnostic products that detect the presence of target substances using antibodies, such as Defendant's SNAP® tests. (FAC, ¶ 14.) Plaintiff does not have its own reference laboratory, but was planning to outsource its laboratory work. (UF, ¶ 17.)

On June 30, 2006, Plaintiff initiated this lawsuit against Defendant. On September 26, 2006, Plaintiff filed a filed a First Amended Complaint ("FAC"), alleging eight causes of action: (1) Exclusive Dealing under § 1 of the Sherman Act, § 3 of the Clayton Act; (2) Monopolization of Trade, § 2 of the Sherman Act; (3) Attempt to Monopolize Trade, § 2 of the Sherman Act; (4) California Unfair Competition; (5) Intentional Interference with Business Contractual Relations under California Law; (6) Interference with Prospective Business Advantage under California Law; (7) Illegal Tying Per Se, § 1 of the Sherman Act; and (8) Illegal Tying Rule of Reason, Sherman Act.

The FAC alleges that Defendant has long been and continues to be the dominant manufacturer and seller of veterinary diagnostic products in the United States, (FAC, ¶ 24), and that Defendant sells its animal diagnostic products to distributors under an unlawful exclusive arrangement, in which the distributor is permitted to sell Defendant's products only if it agrees to refrain from promoting or selling a competing product. (FAC, ¶ 46.) Plaintiff claims that these exclusive dealing agreements restrain competition and aid Defendant in maintaining monopoly power in the animal diagnostic product market. (FAC, ¶ 38.) Plaintiff further alleges that via Defendant's SNAP® FIV/FeLV Combo Test, Defendant has illegally tied the sale of Feline Leukemia Virus ("FeLV") diagnostic tests to the separate diagnostic tests for Feline Immunodeficiency Virus ("FIV"), for which it holds the exclusive

---

2. Defendant has submitted two supplemental statements of undisputed facts in support of its reply in support of its summary judgment motion, one dated August 31, 2007, and another dated September 21, 2007. The Court only considered the undisputed facts in the August 31, 2007 statement, as Plaintiff has had no opportunity to respond to the statement filed on September 21, 2007.

rights to patents from the University of California. (FAC, ¶ 119.)

On March 13, 2007, Defendant moved for summary judgment on all eight causes of action. The Court granted Plaintiff a continuance until September 10, 2007 to conduct discovery. Defendant's motion is now before the Court.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) establishes that summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party satisfies the burden, the party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial. *Id.* at 257, 106 S.Ct. 2505.

A non-moving party who bears the burden of proving at trial an element essential to its case must sufficiently establish a genuine dispute of fact with respect to that element or face summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Such an issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505.

If the moving party seeks summary judgment on a claim or defense for which it bears the burden of proof at trial, the moving party must use affirmative, admissible evidence. Admissible declarations or affidavits must be based on personal knowledge, must set forth facts that would be admissible evidence at trial, and must show that the declarant or affiant is competent to testify as to the facts at issue. Fed.R.Civ.P. 56(e).

## III. DISCUSSION

Defendant moves for summary judgment on a number of grounds. The Court will address each in turn.

 A. *Count 1: Illegal Exclusive Dealing Arrangements, § 1 of the Sherman Act; § 3 of the Clayton Act*

 *1. Section 1, Sherman Act*

■ Section 1 of the Sherman Act "prohibits conspiracies and agreements that unreasonably restrain trade." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir.1989); 15 U.S.C. § 1. To establish a § 1 violation, a plaintiff must demonstrate three elements: (1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged, i.e., an "antitrust injury" *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 811 (9th Cir. 1988); accord *Eichman v. Fotomat Corp.*, 871 F.2d 784 (9th Cir.1989).

Not every agreement that restrains competition violates the Sherman Act. Rather, to be unlawful, the agreement must *unreasonably* restrain competition. *McDaniel v. Appraisal Inst.*, 117 F.3d 421, 422 (9th Cir.1997); *Thurman Indus.*, 875 F.2d at 1373; *Levine*, 72 F.3d at 1545. Courts analyze the unreasonableness of the agreement under either a per se rule of illegality or a rule of reason analysis. *McDaniel*, 117 F.3d at 422; *Thurman Indus.*, 875 F.2d at 1373.

■ Courts evaluate challenges to exclusive dealing contracts under the rule of reason. *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir.1997) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)). Under the rule of reason, courts begin with an identification of the relevant market, then proceed by considering all the circumstances of the case to determine if the exclusive arrangement imposes an unreasonable restraint of trade. (*Id.*) "Only those arrangements whose 'probable' effect is to 'foreclose competition in a substantial share of the line of commerce affected' violate Section 3." *Id.*

### 2. Section 3, Clayton Act

Section 3 of the Clayton Act provides that:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods ... or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

■ In exclusive-dealing cases, a greater showing of anticompetitive effect is required to establish a Sherman Act violation than a § 3 Clayton Act violation. *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1304, fn. 9 (9th Cir.1982).

### 3. Standing and Antitrust Injury

Count 1 of the FAC alleges unreasonable restraint of trade, in violation of § 1 of the Sherman Act and § 3 of the Clayton Act Plaintiff claims Defendant violated these sections by selling its animal diagnostic products under an exclusive arrangement in which the distributor is permitted to sell Defendant animal diagnostic products only if the distributor agrees to retrain from promoting or selling any product that Defendant deems "competitive" with Defendant's products or services. (FAC, ¶ 46.) Plaintiff argues that such arrangements substantially lessen and/or foreclose competition and entry of products in the relevant market, since Defendant will not sell its products to distributors who do not adhere to the exclusive dealing arrangement. (FAC, ¶¶ 47, 75.) Plaintiff alleges injury in that Defendant has used its market power to force its distributors to cancel "implied purchase agreements for substantial orders of molecular based diagnostic products from Cyntegra." (FAC, ¶¶ 48, 79.)

Defendant contends that Plaintiffs antitrust claims must fail because Plaintiff lacks the requisite standing. Defendant asserts that Plaintiff never had and does not currently have any products or services, relevant to this case, to sell.

The standing provision of § 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue...." 15 U.S.C. § 15(a). Although this language could be read to afford relief to all persons whose injuries are causally related to an antitrust violation, *Lucas v. Bechtel Corp.*, 800 F.2d 839, 843 (9th Cir.1986), the doctrine of "antitrust standing" precludes such an interpretation. *Los Angeles Memorial Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1363 (9th Cir.1986). Thus, "[o]nly those

who meet the requirements for 'antitrust standing' may pursue a claim . . .; and to acquire 'antitrust standing,' a plaintiff must adequately allege and eventually prove 'antitrust injury.' " *Glen Holly Entertainment, Inc. v. Tektronix Inc.*, 352 F.3d 367 (9th Cir.2003) (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 530–35, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

 Antitrust injury, which "stems from the competition-reducing aspect or effect of the defendant's behavior," *Atlantic Richfield v. USA Petroleum*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), is made up of four elements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *American Ad Management, Inc. v. General Telephone Co. of California*, 190 F.3d 1051, 1055 (9th Cir. 1999). Additionally, antitrust injury requires that the "injured party be participant in the same market as the alleged malefactors," *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir.1985), meaning a plaintiff must have suffered injury in the same market where competition is being restrained. *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 352 F.3d 367 (9th Cir.2003).

 Here, Plaintiff's standing claim rests on its position as a potential new entrant into the market. Whereas some courts have held that potential new entrants into a market may not recover under § 4 because the amount of damage sustained is not sufficiently ascertainable, and thus a plaintiff has not suffered tangible injury to his or her business or property, *Parks v. Watson*, 716 F.2d 646, 659 (9th Cir.1983) (citation omitted), the Ninth Circuit has adopted the view that a potential new entrant into the market may have antitrust standing. *Solinger v. A & M Records, Inc.*, 586 F.2d 1304, 1309 (9th Cir.1978). Specifically, a potential new entrant "who has taken substantial demonstrable steps to enter an industry and who is thwarted in that purpose by antitrust violations, has suffered a possible ascertainable loss." *Id.* To evaluate whether a plaintiff who has borne an injury has antitrust standing, the Ninth Circuit sometimes utilizes the "intention and preparedness" test, which focuses on the following four factors:

1. The background and experience of plaintiff in his prospective business . . .

2. Affirmative action on the part of plaintiff to engage in the proposed business . . .

3. The ability of plaintiff to finance the business and the purchase of equipment and facilities necessary to engage in the business . . .

4. The consummation of contracts by plaintiff. . . .

*Id.* at 1309–10 (quotation omitted). While these four *Solinger* factors are neither exclusive nor necessarily applicable in every case, the Court concludes they are adequate for review of the issue in this case.

 Applying the first *Solinger* factor, the background and experience of Plaintiff in his prospective business, the evidence demonstrates that Plaintiffs sole employee and founder, Brodie, has little background or experience in the market of molecular diagnostic testing. Brodie is unaware of differences between certain common diagnostic testing techniques. (UF ¶ 132.). In addition, Brodie testified at deposition that he has never taken a course of a technical or scientific nature (UF ¶ 128), or any courses that focus on management or business. (UF, ¶ 129.)

As for the second *Solinger* factor, the evidence shows that any steps Plaintiff took to engage in the proposed business were only preliminary or exploratory in nature. *See Parks v. Watson,* 716 F.2d 646, 660 (9th Cir.1983) (finding affirmative action was lacking because the business owner's actions were only "preliminary"). For example, although Brodie contends he developed marketing through face-to face time with veterinarians, conducted presentations to veterinary offices, visited clinics, presented at conventions, and spoke with veterinarians who suggested specific pathogens they would like (UF ¶ 132; Ex. I at 158:22–161:20), these actions merely indicate that Plaintiff was exploring the market. Defendant, on the other hand, has presented evidence that Plaintiff has never had an office except for one located for a short time at the residence of Robert Stephenson. (UF ¶ 145.) In addition, Brodie never developed a formal business plan (UF ¶ 137), Plaintiff had no other employees besides its founder Brodie (UF ¶ 135), Plaintiff never acquired a laboratory or employed a laboratory manager (UF ¶ 136), Plaintiff never contacted an investment bank or venture capital firm to raise capital (UF ¶ 138), and Plaintiff never obtained a license to sell the canine influenza test, one of the few products it purported to sell. (UF ¶ 139.) Furthermore, despite claiming to have a patent pending for its veterinary diagnostic system, aside from Brodie's declaration, Plaintiff has failed to provide the Court with any other evidence regarding the patent. (Ex. 2, ¶ 6.)

The third *Solinger* factor, the ability of Plaintiff to finance the business and the purchase of equipment and facilities necessary to engage in the business, also weighs in favor of Defendant. Again, Plaintiff never hired employees, leased equipment or vehicles, or leased a reference laboratory. (UF ¶¶ 135–136, 146.) Plaintiff argues it did not lease equipment or purchase a reference laboratory because it planned to use technology developed by other companies in order to reduce its own research and development costs. (Opp'n at 23.) Nonetheless, that Plaintiff could not even afford to maintain its website and server is strong evidence of Plaintiff's inability to finance its business venture. (UF ¶ 142.) Moreover, while Brodie testified that one of his main steps in 2007 has been to seek additional investment for his company, Plaintiff has not offered any evidence of success in securing the additional investment. (Ex. G at 499:14–25.)

Lastly, with respect to the fourth *Solinger* factor, aside from unsupported claims, the record lacks evidence that Plaintiff consummated any contracts. Plaintiff's evidence, e-mails between Plaintiff and the distributors with Butler Animal Health Supply (Ex. 7 at 02435), MWI Vet. Supply Co. (*Id.* at 02437), and Columbus Serum Co. (*Id.* at 02438), merely indicate that Plaintiff was in the process of negotiating distribution arrangements for its products. However, while courts have generally held that valid and binding contracts constitute "property," injury to which will give a plaintiff standing, mere negotiations toward contracts are not "business or property" deserving of antitrust protection. *Hecht v. Pro–Football, Inc.,* 187 U.S.App. D.C. 73, 570 F.2d 982, 994–995 (1977).

Furthermore, based on the record, it is unclear whether Plaintiff ever had any products to sell. Demonstrating that a new diagnostic product is viable requires validation testing and other steps. (UF, ¶ 105.) However, the Veterinary Information Network cautioned veterinarians not to purchase Plaintiffs canine influenza sample collection kit because it was not supported by validation testing. (UF, ¶ 107.) Plaintiff admits that "additional

validation may have been required" for its products. (UF, ¶ 108.)

Under these circumstances, the Court finds that Plaintiff has failed to raised material questions of fact relevant to Plaintiff's intention and preparedness to enter the business of veterinary diagnostic testing. Accordingly, Plaintiff lacks antitrust standing to assert its § 1, Sherman Act and § 3, Clayton Act claims. Defendant's motion for summary judgment on standing grounds is therefore GRANTED.

### B. Counts 2 and 3: *Sherman* Act § 2. *Monopoly* Power in *the Relevant* Market

Section 2 of the Sherman Act states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize ... trade shall be guilty" of an antitrust violation. 15 U.S.C. § 2. As with Plaintiff's claims in Count 1, to enforce § 2 of the Sherman Act, Plaintiff must satisfy the standing requirement of § 4 of the Clayton Act. For the same reasons discussed with respect to Plaintiff's claims for unreasonable restraint of trade in Count 1, Plaintiff does not have standing to assert a monopolization or attempted monopolization cause of action. However, even if Plaintiff did have standing, Plaintiff's claims would still fail since Plaintiff cannot satisfy the elements of a monopolization claim.

To establish a violation of § 2, a plaintiff must show that (1) the defendant possessed monopoly power in the relevant market, and (2) the defendant willfully acquired or maintained that power through "anticompetitive conduct," as opposed to gaining that power as a "consequence of a superior product, business acumen, or historical accident." *Image Tech. Serv., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202, 1208 (9th Cir.1997).

### 1. *Monopoly Power*

The first element of a § 2 claim requires monopoly power (also known as market power), which is "the power to control prices or exclude competition." *Grinnell,* 384 U.S. at 571, 86 S.Ct. 1698 (quotation omitted). Market power can be proven by either direct evidence of the "injurious exercise of market power," or through circumstantial evidence. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d at 1434 (9th Cir.1995). To prove market power by circumstantial evidence, a plaintiff must: "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.* (citations omitted). A rebuttable presumption of market power arises where the defendant has 65% or more of the relevant market. See *Image Technical Serv.,* 125 F.3d at 1206.

#### (a) Relevant Market

The relevant market is the field in which meaningful competition is said to exist, see *United States v. Continental Can Co.,* 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed.2d 953 (1964), and generally encompasses notions of geography as well as product use and quality. *Oltz v. St. Peter's Community Hosp.,* 861 F.2d 1440, 1446 (9th Cir.1988). Ordinarily, defining the relevant market is a factual inquiry reserved for the jury. *Id.*

Plaintiff argues the relevant product market is the "*diagnostic tests* sold to veterinary clinics, including tests that provide rapid results, and tests where a sample is taken by the veterinarian and the results are provided by reference laboratories to the veterinarian." (SGI, ¶ 26.) Defendant contends the relevant market is

not the separate collection test/kits *themselves*, but rather, the actual *service* provided to the buyer, which is an animal test, whether performed at the reference lab on a sample collected in the clinic, or performed entirely in-clinic. (Second Dorman Dec. ¶ 4.) Thus, the relevant market includes "in-clinic testing and reference laboratories." (UF, ¶ 26.)

Plaintiff has failed to produce admissible evidence supporting its definition of the relevant product market. Plaintiffs only evidence is Dr. Nisha Mody's expert witness rebuttal report, a document struck by the Court on September 21, 2007, for failure to comply with Fed.R.Civ.P. 26. (See Docket No. 154.) Defendant, on the other hand, has submitted competent summary judgment evidence showing the relevant competition is between the various suppliers and methods for animal testing, not between suppliers of collection/test kits. (Second Dorman Dec. ¶ 4.) Veterinary clinics have two alternative methods available for animal testing. (*Id.* at ¶ 7.) They may either collect samples and send them to a reference lab for analysis, or they may analyze the samples in the clinic. (*Id.*) Many reference labs provide collection kits free to their customers, and charge the veterinarians only after the lab analysis has been performed. (*Id.* at ¶ 4; UF, ¶ 163.) Furthermore, other distribution companies supply test results, not sample collection kits. (UF, ¶ 162.) Because Plaintiff has offered no other documents or third-party reports to support its contention that the relevant market is diagnostic kits rather than testing services, the Court assumes the "relevant market" at issue here is animal testing services, and the issue need not go the jury.

*(b) Dominant Share of the Relevant Market and Significant Barriers to Entry*

Measurement of market share is necessary to determine whether the defendant possesses sufficient leverage to influence marketwide output. *Rebel Oil,* 51 F.3d at 1438. With a dominant share of the market's productive assets, a firm may have the market power to restrict marketwide output and, hence, increase prices. *Id.* (citation omitted).

 Here, Plaintiff has failed to show Defendant owns a dominant share of market power in the relevant market of in-clinic diagnostic tests and reference laboratory services. In contrast, Defendant has provided undisputed evidence that its market share is less than 40%,[3] and that a competing distributor, VCA Antech, has revenues more than twice those of Idexx.[4] (UF, ¶ 34; Second Dorman Dec. ¶ 8.) Moreover, even if Plaintiff could prove substantial or dominant market share, Plaintiff would still have to prove that new rivals are barred from entering the market. *Rebel Oil Co.,* 51 F.3d at 1438. Defendant, however, has set forth evidence that two other suppliers of reference lab services, Zooligix and VDXI, have recently entered the market. (UF ¶¶ 41, 48.) In addition, a new collaboration between VCA

---

**3.** While Plaintiff disputes Defendant's 40% figure, contending instead that Defendant's market share is at least 70%, Plaintiff improperly derives this figure from its own definition of the relevant market, consisting only of in-clinic veterinary diagnostic products. (SGI, ¶ 34.) However, as discussed in Section B1(a), the Court has already determined that the relevant market consists of in-clinic tests and reference laboratory services. In its papers, Plaintiff does not dispute that within this latter definition of the relevant market, Defendant's market share is less than 40%.

**4.** VCA Anteck has reference lab revenues of $221.1 million, while Idexx has reference lab revenues of $99.6 million. (Dorman Rebuttal Dec. ¶ 8.)

Antech, defendant's largest competitor, and Fair Isaac Diagnostics, was just announced in May 2007. (UF ¶ 168.) Through this collaboration, Fair Isaacs is selling molecular diagnostic products exclusively through VCA Antech, demonstrating that a manufacturer of molecular diagnostic tests for animals found a channel to bring its products to market. (UF ¶ 170.)

Because Plaintiff has failed to raise a genuine issue as to the first element of a monopoly power claim under the Sherman Act—whether Defendant possesses monopoly power in the relevant market—the Court need not address the second element of whether Defendant willfully acquired or maintained that power through "anticompetitive conduct." *Image Tech.*, 125 F.3d at 1208.

The Court hereby GRANTS summary judgment on Plaintiffs § 2 Sherman Act claims, Counts 2 and 3.

### C. *Counts 7 and 8: Illegal Tying Claims. Sherman Act*

A tying arrangement exists when a seller conditions the sale of one product or service (the tying product or service) on the buyer's purchase of another product or service (the tied product or service). See *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Plaintiff alleges Defendant engaged in unlawful tying by conditioning the sale of the FeLV diagnostic test on the purchase of the separate FIV diagnostic test, for which Defendant holds exclusive patents. (FAC, ¶ 119.)

To establish a claim under § 1 of the Sherman Act; a plaintiff must prove: (I) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product, under either a per se rule

of illegality or a rule of reason analysis; and (3) that the tying arrangement affects a "not insubstantial volume of commerce" in the tied product market. *Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991). Implicit in these elements is the need of the seller of the tying product "to force the buyer into the purchase of the tied product that the buyer did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir.2003). The Rule of Reason requires the fact-finder to examine the anti-competitive effects and the pro-competitive effects of the defendant's challenged business practice to determine whether, on balance, the practice is unreasonable. *Bhan*, 929 F.2d at 1413.

#### 1. *Standing*

Two types of plaintiffs have standing to challenge illegal tying arrangements—purchasers who are forced to buy the tied product to obtain to the tying product, and competitors who are restrained from entering the market for the tied product *Eastman Kodak*, 504 U.S. at 462–463, 112 S.Ct. 2072. In both these situations, standing rests on whether the plaintiff has been "adversely affected by an anticompetitive aspect of the defendant's conduct," *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), that is, the allegedly illegal tying arrangement.

In this case, Plaintiff does not fit into either category of plaintiff. Although Plaintiff contends it has standing because it has been precluded from competing in the relevant market, Plaintiff has failed to show it offered an FeLV-only or FIV-only product that would compete with Defendant's allegedly tied products. Without a

competing product, Plaintiff cannot show it was "adversely affected" by Defendant's allegedly illegal tying arrangement, and thus has no standing.

### 2. Tying of Two Distinct Products or Services

■ Even assuming Plaintiff had standing to assert its tying claims, Plaintiff's tying claims would nonetheless fail for lack of evidence that the FeLV and FIV tests are two distinct products. For these tests to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide the two tests separately. *Eastman Kodak Co.*, 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Defendant's evidence, however, demonstrates that consumer demand for a stand-alone FIV test is so low that it would be uneconomic for any company to offer it as an in-clinic test separately from FeLV. (UF, ¶ 89.) In 1996, Defendant's revenues from the FIV-only test amounted to approximately $50,000, as opposed to $4.4 million in revenues from the FeLV test, and $17 million from its combined FIV/FeLV test. (UF, ¶¶ 91–92.) In 2006, 95% of requests made by veterinarians were for the combined FIV/FeLV test. (UF, ¶ 95.) Since 2004, Defendant has received only three inquiries about the possibility of an FIV in-clinic test out of nearly 2000 inquiries during that time about the FIV. (UF, ¶ 97.)

Plaintiff contends that because Defendant offered the in-clinic FeLV and FIV tests separately in the 1980's and 1990's, there was at least some demand for the two tests as separate products before Defendant began offering them only in combination. (Exs. 36–37 [5]; UF, ¶ 90.) However, that Defendant at one time offered the

two tests separately does not prove that there was "sufficient consumer demand" when Defendant began offering the in-clinic FeLV and FIV tests only in combination. *See Eastman Kodak*, 504 U.S. at 461, 112 S.Ct. 2072. Here, Plaintiff has failed to offer any evidence showing what the demand was for the stand-alone FIV test, or that there was sufficient demand to make it efficient for Defendant to offer the two tests separately.

Finally, sound medical reasons support Defendant's contention that there is no separate FIV testing demand, since the Report of the American Association of Feline Practitioners and Academy of Feline Medicine Advisory Panel on Feline Retrovirus Testing and Management recommends that "[a]ll cats should be tested for infection with feline leukemia virus (FeLV) and feline immunodeficiency virus (FIV)." (UF, ¶ 98.)

In sum, Plaintiff fails to raise a triable issue of material fact as to whether the two tests are indeed separate products. So under either a per se or rule of reason analysis, Plaintiff's tying claims must be dismissed. Accordingly, the Court GRANTS summary judgment as to Plaintiffs tying claims, Counts 7 and 8.

### D. Counts 5 and 6: Intentional Interference with Business Contractual Relations and Prospective Business Advantage

■ In order to prevail on a claim for intentional interference with contractual relations or prospective economic advantage, Plaintiff must show: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the

---

5. The Court overrules Defendant's objections to Exs. 3–4, 6–18, 20–33, and 40–43 on authentications grounds. Plaintiff has submitted a declaration by its counsel stating that *the exhibits are what Plaintiff purports them to be.*

defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *TransWorld Airlines, Inc. v. American Coupon Exchange, Inc.*, 913 F.2d 676, 689 (9th Cir.1990).

Plaintiff's claims rest on the unlawfulness of Defendant's Distribution Agreements, wherein the distributor is permitted to sell Defendant's animal diagnostic products only if the distributor agrees to refrain from promoting or selling any product that Defendant deems "competitive" with its products or services. (FAC, ¶ 46.) Plaintiff alleges injury in that Defendant has used its market power to force its distributors to cancel "implied purchase agreements for substantial orders of molecular based diagnostic products from Cyntegra." (FAC, ¶¶ 48, 79.)

Aside from general allegations, Plaintiff has not set forth evidence to establish a prima facie case of intentional interference with contractual relations or prospective economic advantage. A party opposing a motion for summary judgment may not rely on allegations or denials contained in the pleading, but must provide facts to demonstrate there is a genuine issue for trial. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Plaintiff makes only general unsupported allegations of actual disruption of the relationships between Plaintiff and distributors, and resulting damage. Therefore, the Court GRANTS summary judgment on Counts 5 and 6.

### E. *Count 4: California Unfair Competition*

Cal. Bus. & Prof.Code 17200 prohibits unfair competition, which is defined as "any unlawful, unfair or fraudulent business act or practice." "By proscribing 'any unlawful' business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180, 83 Cal. Rptr.2d 548, 973 P.2d 527 (quotation omitted).

Here, none of Plaintiffs antitrust, monopoly, tying or intentional interference claims survive summary judgment. Consequently, there is no violation of other laws to provide a basis for an unfair competition claim. Summary judgment as to Plaintiff's unfair competition claim is GRANTED.

## IV. CONCLUSION

Based on the foregoing, the Court hereby GRANTS Defendant's Motion for Summary Judgment. It is hereby ordered that this case be DISMISSED in its entirety, with prejudice.

Defendant is ordered to submit a proposed order of judgment, in accordance with this Order, due November 5, 2007.

IT IS SO ORDERED.